OPINION
Defendant-appellant Deirdre Weaver appeals her conviction and sentence from the Licking County Court of Common Pleas on nine counts of child endangering in violation of R.C. 2919.22(B)(2). Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
Appellant Deirdre Weaver is the biological mother of Brittany Turnbill Weaver, Charles Weaver, and Michelle Weaver. In June of 1999, appellant and her husband took four foster children into their home, namely, Elizabeth, Timothy, David and Robert Swisher. At the time, Elizabeth was one year old, Timmy was four years old, David was two years old and Robert was three years old.
On July 21, 2000, the Licking County Grand Jury indicted appellant on nine counts of child endangering in violation of R.C. 2919.22(B)(2) and/or (B)(4), felonies of the third degree. The nine counts contained in the indictment concerned both all of appellant's biological children and all of her foster children. The following is a summary of the nine counts contained in the indictment:
Count Alleged Victim Date Offense Allegedly Occurred
1 Timothy Swisher between 6/22/99 and 2/9/2000
2 David Swisher between 6/22/99 and 2/9/2000
3 Robert Swisher between 6/22/99 and 2/9/2000
4 Elizabeth Swisher between 6/22/99 and 2/9/2000
5 Charles Weaver between 3/3/94 and 3/3/95
6 Charles Weaver between 3/3/98 and 3/3/99
7 Michelle Weaver between 9/7/98 and 9/7/99
8 Brittany Weaver between 5/1/99 and 6/30/99
9 Brittany Weaver between 11/1/99 and 12/31/99
At her arraignment on July 31, 2000, appellant entered a plea of not guilty to the charges contained in the indictment.
Subsequently, a bench trial commenced on November 13, 2000.[1] At the conclusion of the trial, the trial court, as memorialized in a Judgment Entry filed on November 14, 2000, found appellant guilty of nine counts of child endangering in violation of R.C. 2919.22(B)(2), felonies of the third degree. At the sentencing hearing on December 11, 2000, appellant was placed on community control for a period of five years. As part of her community control, appellant was ordered to serve six months in the Licking County Justice Center.
It is from her conviction and sentence that appellant now prosecutes her appeal, raising the following assignment of error:
 THE TRIAL COURT COMMITTED HARMFUL ERROR IN FINDING THE DEFENDANT-APPELLANT GUILTY OF EACH COUNT CONTAINED IN THE INDICTMENT.
 I
Appellant, in her sole assignment of error, agues that her conviction on nine counts of endangering children in violation of R.C. 2919.22(B)(2) is against the sufficiency of the evidence.
In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Jenks, supra, at paragraph two of the syllabus.
As is stated above, appellant in the case sub judice was convicted of nine counts of child endangering in violation of R.C. 2919.22(B)(2), felonies of the third degree. Such section states as follows:
 (B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:
(2) Torture or cruelly abuse the child;
The Ohio Supreme Court has held that recklessness is an essential element of an endangering children offense pursuant to R.C.2919.22(B)(2). See, e.g., State v. McGee (1997), 79 Ohio St.3d 193,195. The term "cruelly abuse" is not defined in the statute, nor is a definition provided in Ohio Jury Instructions. Rather, the term is such that a person of ordinary sensibilities and intelligence should be capable of ascertaining its meaning. See State v. Artis (1989),46 Ohio App.3d 25, 26.
In State v. Nivert (Oct. 18, 1995), Summit App. Nos. 16806 and 16843, unreported, the court defined the terms "torture" and "cruelly abuse" as follows:
 "`Torture' is defined as: (1) the infliction of severe plain or suffering (of body or mind); (2) acting upon violently in some way, so as to strain, wrench, distort, twist, pull or knock about. XI Oxford English Dictionary (2 Ed. 1933) 169-70. To treat someone `cruelly' is to: (1) demonstrate indifference to or delight in another's suffering; (2) treat severely, rigorously, or sharply. II OED at 1216-17. `Abuse' is defined as: (1) ill-use, maltreat; to injure, wrong or hurt. I OED at 44-5."
 See, also, Black's Law Dictionary (6 Ed.1990) 1490, 377 (stating that to "torture" is "[t]o inflict intense pain to body or mind for purposes or punishment * * * or to sadistic pleasure," and that to act "cruelly" is to intentionally and maliciously inflict "Physical or mental suffering upon living creatures" or to wantonly, maliciously, and unnecessarily inflict "pain upon the body, or the feelings and emotions").
See also State v. Dillard (July 23, 1999), Pike App. No. 98CA627, unreported.
As is stated above, the first four counts in the indictment in the casesub judice concern appellant's four foster children, Elizabeth, Timothy, David and Robert Swisher. The indictment specifically alleges that appellant committed the offense of child endangering with respect to such children between June 22, 1999, when the foster children first came into appellant's home, and February 9, 2000, the date that the children were removed from the same.
At the trial in this matter, appellant's husband, Charles Weaver, Jr., testified that, as a result of appellant striking him after an argument and based on a conversation with Brittany, he became concerned about the well-being of all of the children residing in his house. Because of his concerns, Mr. Weaver hid a video camera in a clock on the kitchen wall. In February of 2000, when he viewed the videotapes, Mr. Weaver saw appellant "taking a plate and rubbing it in David's face and swinging the baby [Elizabeth] around and just escalated from there." Trial Transcript at 47. For such reason, Mr. Weaver contacted an attorney who turned the videotape over to the police. An edited copy of the videotape[2] that was admitted into evidence and reviewed by the Judge at trial shows appellant slapping Elizabeth numerous times while Elizabeth is sitting in a high chair and in her playpen, turning Elizabeth upside down by one leg, and jerking all of her foster children around. In addition, the videotape shows appellant pushing one of her foster son's faces into a plate of food several times and then yanking his head back to wash his face, slapping the younger children during diaper changes, and, in general, pushing and slapping her foster children. On many occasions, appellant slapped the children in the face and buttocks with an open hand.
At the trial in this matter, Brittany, appellant's biological child who was sixteen years old as of the date of the trial, also testified. Brittany testified that, during one incident, appellant spanked Robert, appellant's three year old foster son, after Robert had urinated in his pants. According to Brittany, after giving Robert a bath, appellant "made him go into the bedroom and he laid down, and she went in, like, every so five minutes, ten minutes and just spanked him and just kept doing it."
Trial Transcript at 80 (Emphasis added). Robert was naked at the time. Brittany also testified regarding appellant's interaction with David, appellant's two year old foster son. According to Brittany, when appellant was changing David's diapers, appellant would "take his legs and push them down like that and he'd scream and cry." Trial Transcript at 81. Brittany also testified that, while Robert and David were sitting at the kitchen table, appellant would smack them in the head and "keep going." Trial Transcript at 82. When Charles, Brittany's biological brother, was questioned about appellant's relationship with the foster children he responded that he often saw appellant "beat on them" and smack all of them "really hard." Trial Transcript at 116.
During her testimony, Brittany also testified concerning her own interaction with appellant, which forms the basis for Counts Eight and Nine of the indictment. As is stated above, Count Eight of the indictment covers the period between May 1, 1999, and June 30, 1999. At trial, Brittany testified that during the spring of 1999, she got into a fight with appellant after appellant refused to let her stay out with a friend. Brittany testified that appellant cut Brittany's arm with a knife during the argument. After wiping the cut off, Brittany covered it with a Band-Aid. In turn, Count Nine of the indictment alleges that appellant committed the offense of child endangering with respect to Brittany between November 1, 1999, and December 31, 1999. At trial, Brittany testified that she had another argument with appellant in December of 1999. Brittany specifically testified that, during such incident, appellant "pushed me down in the kitchen and started kicking me in my stomach." Trial Transcript at 83. In total, appellant kicked Brittany in the stomach three times.
Count Five of the indictment concerns an incident involving Charles Weaver, appellant's biological son, that occurred between March 3, 1994, and March 3, 1995, whereas Count Seven of the indictment concerns an incident involving Michelle Weaver, appellant's biological daughter, that took place between September 7, 1998, and September 7, 1999. During the trial in this matter, Brittany also testified about the incidents involving Charles and Michelle. Brittany testified that when Charles was in preschool, she came into a room and found appellant "straddling over him and punching him in the face." Trial Transcript at 84. According to Brittany, Charles received a bloody nose as a result. Charles himself testified at trial that, when he was three years old, appellant punched him in the back of the head, causing his nose to bleed. Since Charles was nine years old as of the date of the trial, the incident would have occurred during approximately 1994, the date set forth in the indictment. With respect to Michelle, Brittany testified that appellant smacked Michelle in the face after Michelle asked for help with her homework. When Michelle, who was eleven years old at the time, was questioned at trial, she testified that when she was ten years old, appellant smacked her across the face because her room was messy. Michelle further testified that appellant smacked her across the face for failing to complete her homework.
Based on the foregoing, we find that, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that appellant cruelly abused her four foster children and her three biological children during the dates set forth in Counts One through Five and Counts Seven through Nine in the indictment.
Count Six, the remaining count of the indictment, alleges that appellant committed the offense of child endangering with respect to Charles Weaver between March 3, 1998, and March 3, 1999. However, upon our review of the record, we find no testimony or other evidence supporting such count. For such reason, appellant's sole assignment of error is sustained as to Count Six.
Appellant's sole assignment of error is, therefore, overruled in part and sustained in part.
Accordingly, the judgment of the Licking County Court of Common Pleas is affirmed in part and overruled in part.
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Licking County Court of Common Pleas is affirmed as to the convictions and sentences for Counts 1 through 5 and 7 through 9 but is reversed as to the conviction and sentence for Count 6. Costs to appellant.
Edwards, P.J.
Wise, J. and Boggins, J. concurs.
[1] A written waiver of a trial by jury, which was signed by appellant, was filed the same day.
[2] While Mr. Weaver obtained approximately fifteen hours of recorded material, only a thirty to forty minute segment of the videotape, which has no sound, was played for the trial court and admitted into evidence without objection.